BANKS, adm'r, *et al. v.* McCANDLESS, adm'r, *et al.*

1. While admissions by one in possession are not good as against a bona fide purchaser for value from him, yet so long as a debtor remains in possession of property which once belonged to him and which his creditor is seeking to condemn as fraudulently conveyed, the res gestæ of the fraud, if any, may be considered as in progress, and his declarations, though made after he has parted with the formal paper title, may, by reason of the continuous possession which accompanied them, be given in evidence for the creditor against the claimant.

2. A plaintiff in a trover case is within the protection of the statute against fraudulent conveyances, even before judgment; and a surety on the defendant's bail-bond in the trover case, who pays the judgment recovered by the plaintiff, is entitled to the same protection.    The rights of creditors should be favored by the courts and every remedy and facility afforded them to detect, defeat, and annul any effort to defraud them of their just rights.

3. It is not apparent to this court that the jury found contrary to the charge of the court, as contended by the plaintiff in error.

4. Under the evidence and pleadings, the charge of the court as to whether "John L. Conley rid himself of his property for the purpose of becoming indebted to" the defendants in error, "or of creating the liability and preventing its collection," was not error.

5. The court below did not err in refusing a nonsuit, or in refusing to direct a verdict for the plaintiff in error; nor can the reviewing court say that the verdict rendered was contrary to the evidence or contrary to law, as averred in the motion for a new trial.

Argued March 10, — Decided March 29, 1904.

Equitable petition.  Before Judge Lumpkin.    Fulton superior court.   June 24, 1903.

*Westmoreland Brothers,* for plaintiffs in error.
*Arnold & Arnold, Burton Smith,* and *L. Z. Rosser,* contra.

TURNER, J.   John L. Conley was the administrator of the estate of Jonathan Broad, deceased, and became indebted to that estate in a large sum, by reason of his appropriation of its assets, and was removed from his trust.   McCandless became the administrator de bonis non of the same estate.   An action of trover was brought against Conley by Marcellus E. Thornton, for certain personal property, in which action bail was required, and A. E. Buck and another became sureties for Conley on the bond given by him in that suit.   A judgment was rendered in that action against Conley and his sureties, and an execution issuing under that judgment was paid off by Buck and his cosurety.   The cosurety having been reimbursed, Buck became the assignee of the execution

by virtue of his payment of the balance due upon it, and in this way became the creditor of Conley. John L. Conley having died, James Banks was appointed administrator of his estate. Against Banks, as such administrator, McCandless, as administrator de bonis non of the Broad estate, and Buck filed an equitable petition to subject to their claims certain lands to which Morris J. Conley, who was also made a party defendant, asserted title. The contention of the plaintiffs was that these lands had belonged to John L. Conley at the time of his death, and that Morris J. Conley, his brother, had acquired them in pursuance of a fraudulent scheme designed to defeat the rights of creditors. The prayer of the petition was that the conveyances made to Morris J. Conley be declared null and void as to the plaintiffs, and that the property be subjected to the payment of their demands, etc. Pending this litigation Buck died, and his executrix, Mrs. Buck, was made a party plaintiff in his stead. On the trial of the case now under review the jury returned a verdict in favor of the plaintiffs, finding that the deeds to the lands in controversy were null and void. The defendant Morris J. Conley moved for a new trial on various grounds, which the court below declined to grant, on condition that the plaintiffs would write off from the recovery some twenty-five acres of the lands covered by the verdict. This condition was complied with by the plaintiffs; whereupon Morris J. Conley excepted to the refusal to grant him a new trial, and brought the case to this court.

1. It is sufficiently obvious that the contest in this case involves the statute of 13th Eliz. c. 5, now embodied in the Civil Code, § 2695. It is familiar law that " The rights of creditors should be favored by the courts, and every remedy and facility afforded them to detect, defeat, and annul any effort to defraud them of their just rights." Civil Code, § 2687. This court has said that " The true law, everywhere and at all times, delighteth in the payment of just debts." *Robert* v. *Tift*, 60 *Ga.* 571. The court below, in endeavoring to administer these legal principles, admitted the testimony of two witnesses that John L. Conley, after the date on which the deeds alleged to have been fraudulently made purport to have been executed, and while in possession of the lands covered by these deeds, made certain declarations to the effect that he was the owner of the lands. The mo-

tion for a new trial complains of the admission of this evidence, and it is urged that proof of these declarations was not competent. One of the vital issues in the case was whether John L. Conley had actually conveyed the lands to his brother, Morris J. Conley, at the time the deeds bear date. One of them, covering the major portion of the lands described in the verdict, recited a consideration of only ten dollars, and, though purporting to have been executed in 1883, was not recorded until 1890. It was insisted by the plaintiffs that there were various other indications of fraud in connection with the execution of this conveyance, which supported their contention that at the time John L. Conley made the declarations above referred to, he was holding possession in his own right, and had not in fact made any deed to Morris J. Conley to the lands in controversy. In view of this contention and of the evidence offered by the plaintiffs in support of it, we think the declarations of John L. Conley were admissible for the purpose of showing the capacity in which he held possession of the lands. The defendant Morris J. Conley claimed that he had become the owner of the land in 1883, and had leased it to Eliza T. Conley, the wife of John L., and that accordingly it was not competent for the plaintiffs to prove his declarations, made long thereafter, as to his ownership of the property. It was therefore a material inquiry whether or not, subsequently to the time the defendant Morris J. Conley claimed to have become the owner, John L. Conley, who remained in possession, held it in his own right or under and through his wife, as the lessee of Morris J. Conley. Was he holding in his own right? The evidence objected to illustrated this question. This court announced a similar conclusion in *Ozmore* v. *Hood*, 53 *Ga.* 114, which was a claim case involving the title to a tract of land which was in the possession of the person whose declarations were admitted. This court held that the sayings of the defendant in execution while in possession, or of any other person in possession of the land, are evidence for the plaintiff in execution to show that the defendant, or such third person, was not the tenant of the claimant. In the case of *Oatis* v. *Brown*, 59 *Ga.* 711 (3), this court held that: "So long as a debtor remains in possession of property which once belonged to him, and which his creditor is seeking to condemn as fraudulently conveyed, the res gestæ of the fraud, if any, may be considered as

in progress; and his declarations, though made after he has parted with the formal paper title, may, by reason of the continuous possession which accompanied them, be given in evidence for the creditor against the claimant." And this decision was literally followed in the case of *Williams* v. *Hart,* 65 *Ga.* 201 (4). We accordingly hold that the trial judge did not err in admitting in evidence these declarations of John L. Conley.

2. The inculpated deed from John L. Conley to his brother, Morris J. Conley, bears date July 12th, 1883. The bail-bond in the trover suit instituted by Thornton was given in June of that year. It is insisted in the motion for a new trial that though a judgment was had in the trover suit at a later date, yet at the date of the deed the plaintiff in the trover case did not stand to Conley as a creditor, under the statute of 13th Eliz., and that Buck, who subsequently paid a balance due on the execution issued on that judgment, did not, at the date of the deed just mentioned, occupy the relation of a creditor to John L. Conley, within the meaning of that statute. And it is complained that the court erred in charging the jury as follows: From the " date when the bail-bond was given, the principal and sureties were bound to Thornton for the payment of the eventual condemnation-money; and when a verdict was rendered finding that John L. Conley had been guilty of a conversion of Thornton's property, and a judgment was taken against John L. Conley and his sureties on the bail-bond, and when execution issued upon such judgment and Buck paid off a balance due on such execution, he was entitled to control such execution, as Thornton could have done before it was paid off, for his, Buck's, reimbursement; [and] if, after the giving of such bail-bond, John L. Conley made a conveyance, or conveyances, to his brother, Morris J. Conley, for the purpose of delaying or defrauding Thornton, or the sureties on his bond, as to any liability on such bond, then Buck would be a creditor, within the meaning of the law, who could attack such deed, and his executrix, standing in his place, would have the same right.". By the terms of the famous English statute (13 Eliz. ch. 5) "for the avoiding and abolishing of feigned, covenous, and fraudulent feoffments, gifts, grants, alienations, conveyances, bonds, suits, judgments, and executions, as well of lands and tenements as of goods and chattels, more commonly used and practiced in these days

than hath been seen or heard of heretofore; which feoffments,"
etc., etc., "have been and are devised and contrived of ·malice,
fraud, covin, collusion, or guile, to the end, purpose, and intent to
delay, hinder, or defraud creditors and *others* of their just and law-
ful actions, suits, debts, accounts, damages, penalties, forfeitures,
heriots, mortuaries and reliefs, not only to the let or hindrance of
the due course and execution of law and justice, but also to the
overthrow of all true and plain dealing, bargaining, and chevisance
between man and man, without the which no commonwealth or
civil society can be maintained or continued," it was "declared,
ordained, and enacted that all and every feoffment, gift, grant,
alienation, bargain, and conveyance of lands, tenements, heredita-
ments, goods, and chattels, or of any of them, or of any lease, rent,
common, or other profit or charge out of the same lands, tene-
ments, hereditaments, goods, and chattels, or any of them, by writ-
ing or otherwise, and all and every bond, suit, judgment and exe-
cution at any time had or made sithence the beginning of the
queen's majesty's reign that now is, or at any time hereafter to be
had or made to or for any intent or purpose before declared and
expressed, shall be from henceforth deemed and taken (only as
against that person or persons, his or their heirs, successors, execu-
tors, administrators and assigns, and every of them, whose actions,
suits, debts, accounts, damages, penalties, forfeitures, heriots, mor-
tuaries, and reliefs, by such guileful, covinous, or fraudulent de-
vices and practices, as is aforesaid, are, shall, or might be in any-
wise disturbed, hindered, delayed, or defrauded) to be clearly and
utterly void, frustrate, and of none effect; any pretense, colour,
fained consideration, expressing of use, or any other matter or
thing to the contrary notwithstanding." See 4 Bac. Abr. 401.
Although this statute is strict and even penal, the courts have
long adopted a liberal construction of its provisions. "These
statutes," said Lord Mansfield, "can not receive too liberal a con-
struction, or be too much extended in suppression of fraud." The
statute of 13th Eliz. was meant to prevent deeds "fraudulent in
their concoction," declared Lord Ellenborough. As early as
Twyne's case (2 Coke, 219) it was resolved that "because fraud
and deceit abound in these days more than in former times, . . all
statutes made against fraud should be liberally and beneficially ex-
pounded to suppress the fraud." See Wait on Fraud. Conv. (3d

ed.) §§ 18–20.    The North Carolina Supreme Court, in construing this statute, remarked that its provisions were so plain that "he that runs may read."    *Savage v.* Knight, 92 N. C. 497.    The liberal rule of construction was adopted at an early day in this State by our judges, in a case in which they held that "Statutes against fraud, when they operate upon the offence, are to be liberally construed, so as to avoid the fraudulent transaction."    *Cumming* v. *Fryer, Dudley,* 183.

Our statute (Civil Code, § 2695) declares that "the following acts by debtors shall be fraudulent in law against creditors and *others,* and as to them null and void," — followed by an enumeration of the acts.    This court, in the case of *Westmoreland* v. *Powell,* 59 *Ga.* 256, held that though the words "and others," following the word "creditors," did not appear in the code then of force, in that section in which the provisions of the statute of 13th Elizabeth were intended to be embodied, the omission did not have the effect of limiting the operation of that statute upon fraudulent conveyances.    In view of this decision, the compilers of our present code deemed it proper to insert in the section just cited the important words which had in the former codes been omitted. It is also to be noted that this court further said, in discussing that case, that "the statute of 13th. Elizabeth, in so far as it embraced tort-feasors in its provisions," was still of force in Georgia; and the court accordingly held that a transfer by Westmoreland of property, made after he had committed an assault upon Powell and with a view to defeating the collection of damages for such assault, was void.    In other words, this court held that a person having a claim for unliquidated damages, because of an injury tortiously committed upon him, was, though not in a technical sense a creditor, nevertheless within the protection of the statute. In our present code (§ 2686), the relation of debtor and creditor is thus defined:    "Whenever one person, by contract or by law, is liable and bound to pay to another an amount of money, certain or uncertain, the relation of debtor and creditor exists between them."    This definition is much broader than is generally supposed, and would seem to include a liability for a wrongful conversion of property for which trover would lie.    "In a multitude of cases it has been repeatedly adjudicated that a party bound by a contract upon which he may become liable for the payment of

money, although his liability be contingent, is a debtor within
the meaning of the statute avoiding all grants made to hinder or
delay creditors . . A surety is a creditor from the time the ob-
ligation is entered into, or the bond signed ; " and a " person
whose claim arises from a tort, such as libel or slander, is a cred-
itor.    The date the tort or injury was committed governs in de-
termining the creditor's status, where the conveyance was made
in pursuance of a fraudulent design to defeat the judgment which
might be recovered upon it. . .   So a transfer to defeat a claim
for deceit, . .  breach of promise to marry, seduction, bastardy,
and assault and battery, may be annulled.    And a wife may at-
tack alienations intended to defeat claims for alimony.    In Pen-
dleton v. Hughes [65 Barb. 136], the defendants, at the date of
the fraudulent alienation, had in their possession a 5–20 U. S.
bond belonging to the plaintiff, which they afterward converted.
The court held that plaintiff was equitably entitled to protection
against the fraudulent transfer to the same extent as though the
defendants had been indebted to her in that amount at the time
of the fraudulent alienation."    See Wait, Fraud. Conv. (3d ed.)
§ 90, and the numerous cases cited in support of the text.    Un-
der these authorities it seems clear that Thornton, the plaintiff in
the trover suit, was entitled to the protection of the statute ; and
under these same authorities it would seem that a surety on the
bond given by Conley in the trover suit would also, as an origi-
nal proposition, be entitled to this protection.    But be this as it
may, by an express provision of our law a surety who has paid
the debt of his principal is subrogated, both in law and in equity,
to all the rights of the creditor.    Civil Code, § 2986.    And it
may be added that, without regard to this general rule of subro-
gation, the executrix of Buck undoubtedly had the right to pro-
ceed with the execution against John L. Conley, by virtue of the
assignment thereof to Buck, in the same way as the plaintiff in
execution, Thornton, could have done.    For the reasons above
stated, we have reached the conclusion that the charge of the
court on this subject was not erroneous.

3. The court charged the jury as follows, with regard to the
right of McCandless, as administrator, to attack the conveyances
made by Conley: "If Conley became administrator of Broad in
1881, and gave bond as such, no actual indebtedness to the estate

arose from such fact alone.   Indebtedness to the estate arose upon misappropriation, or devastavit, as it is termed in law, of the assets of the estate by the administrator; and the estate would rank as an actual creditor from the date of such devastavit or misappropriation, and not from the date of the administration or the giving of the bond."   It is complained that the verdict of the jury was contrary to this charge.   We do not wish to be understood as entirely approving this charge; but as no question touching its correctness is presented by the record before us, we make no ruling as to whether or not it was altogether sound.   Suffice it to say that the jury might well have found, under the evidence submitted for their consideration, that the deed purporting to have been made on July 12, 1883, was not in fact executed until after the devastavit occurred.   It can not, therefore, be said that their verdict was contrary to that charge.

4. Complaint is made in the motion for a new trial that the court committed error in giving the following instruction to the jury:   "If the plaintiffs were not actual creditors at the time of these conveyances, but there was a prospective or possible liability, did or did not John L. Conley rid himself of his property for the purpose of being indebted to them or of creating the liability and preventing its collection?"   The complaint made of this charge is that it had no application   to the case on trial.   We think that, under the pleadings and the evidence in the case, the jury had a right to reach the conclusion that John L. Conley had stripped himself of all of his property, with a view to avoid any liability accruing after, as well as before, the making of the conveyances alleged to have been fraudulent as to creditors.

5. When this case was here before (115 *Ga.* 48), this court held that the "judgment of nonsuit as to Banks, administrator, and Morris J. Conley was erroneous."   And in no view of the evidence adduced at the last trial can it be said that the court below erred in refusing to direct a verdict in favor of the defendant Conley.   In the formal grounds of the motion for a new trial it is insisted that the verdict of the jury was contrary to law, contrary to the evidence, etc.   On substantially the same evidence in behalf of the plaintiffs, introduced on the former trial above referred to, this court in effect held that they made out a prima facie case.   As to the case being made out to this extent, at least,

the plaintiff in error is concluded. It is true that on the last trial he undertook to meet the case of the plaintiffs by counter-evidence. Whether or not this was done successfully was a matter peculiarly within the province of the appointed tribunal — the jury. The jury saw the witnesses and observed their tone and manner; and had before them, transpiring in their presence, all the significant incidents of the trial. Some of these matters were incapable of transmission to this court. The jury, therefore, had better facilities for weighing the questions of fact than this court can possibly have. In the exercise of their appropriate functions, they found a verdict for the plaintiffs. We can not, from merely reading the transcript, come to a different conclusion from that reached by the jury. This case has been the occasion of many interesting conflicts. It had numerous branches, including trover and bills in equity. It is a well-trodden field. Every part of the ground has been fought over. First there was a demurrer, which was overruled; then there was a trial at which a nonsuit was had, and this court, on exceptions to that judgment, held fast to the judgment on the demurrer, and decided that, rather than a nonsuit, the evidence warranted a verdict. A verdict has now been had by men of the vicinage, upon practically the same evidence for the plaintiffs, and a fair-minded and excellent judge, who presided at the trial, and had heard the evidence also on a former trial, and reviewed it again on this motion for a new trial, has given his approval to the conclusions of the jury. We agree with him. The case is now stratified, and will serve hereafter only to reward the diligence of those who dig deep for legal precedents.

*Judgment affirmed. All the Justices concur.*